Filed 1/27/25  Douglas Emmett 2013 v. I&G Direct Real Estate 10 CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DOUGLAS EMMETT 2013, LLC,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>    v.<br><br>I&G DIRECT REAL ESTATE 10, LP,<br><br>    Defendant, Cross-complainant and Respondent. | B324637<br><br>(Los Angeles County Super. Ct. No. BC708800) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Thomas D. Long, Elizabeth Allen White, and Laura A. Seigle, Judges.  Affirmed.

Greines, Martin, Stein & Richland, Kent L. Richland, David E. Hackett and Alex Chemerinsky for Plaintiff, Cross-defendant and Appellant.

Allen Matkins Leck Gamble Mallory & Natsis, Anthony J. Oliva and Nancy S. Fong for Defendant, Cross-complainant and Respondent.

This appeal requires the court to construe a rent adjustment provision in a long-term land lease. The lease, originally executed in 1979, had fixed rental payments for the first 25 years. After that initial period, and at fixed intervals thereafter, the rent was subject to an upward adjustment if necessary to reach an annual payment equivalent to 9 percent of the land's fair market value. The parties dispute how that fair market value is to be determined.

The dispute centers on language in the lease's rent adjustment provision. That provision requires an appraisal of the property "subject to the restrictions on use" set forth in a separate article of the lease. That separate article contains two sections. One of those sections, section 8.01, states that the tenant "may use the Property for general office use, commercial use, and all related or ancillary uses." The other section requires the tenant to comply with the law.

Landlord/appellant Douglas Emmett 2013, LLC (Emmett) argues that section 8.01 means the tenant may, but need not, use the land for the stated purposes. Emmett claims that the value of the land should therefore be determined as if it could be used for *any* profit-making purpose, including residential or mixed residential and other uses. Tenant/respondent I&G Direct Real Estate 10, LP (I&G) argues that section 8.01 requires the property to be used for the purposes described in that section, and the value of the property therefore must be set in light of this restriction. The trial court agreed with I&G.

We affirm. In the context of the entire lease, section 8.01 must be interpreted as a *restriction* on use rather than simply as a *description* of the tenant's intended use, as Emmett contends.

Interpreting section 8.01 as a restriction is the only alternative that explains the presence of that section in the lease.

## BACKGROUND

**1.      The Lease**

The lease (Lease) concerns property for the Warner Center in Woodland Hills (the Property).[1]  The Lease was executed in August 1979.  It originally was set to expire in 2054, but was later amended to extend to 2074.  Emmett and I&G are both successors in interest to the original landlord and tenant.

Section 3.05, contained in article III, sets the rent.  For the first 25 years, rent was fixed at $185,142 annually.  Thereafter, rent was to be 9 percent of the fair market value of the "Demised Premises" annually, as determined by agreement or appraisal every 25 years.  Section 3.05(b) states that the value "shall be determined as if the Demised Premises were vacant, unimproved, unencumbered and free of this Lease, but subject to the restrictions on use set forth in Article VIII of this Lease."  The Lease was amended several times but this valuation language was not changed.

Article VIII contains two sections:  section 8.01 and section 8.02.  As mentioned, section 8.01 states that "[t]enant may use the Property for general office use, commercial use, and all related or ancillary uses."  Section 8.02 is the section on legal compliance.  It states that "[i]n the use and occupation of the Property and the conduct of such business thereon Tenant shall, subject to the provisions of Article IX, comply with all laws,

---

[1] The Lease defines the land subject to the Lease as the " 'Demised Premises' " and the land plus improvements as the " 'Property.' "

3

orders, ordinances, rules and regulations of federal, state, county and municipal authorities, including, without limiting the generality of the foregoing language, the obtaining of any certificates of occupancy and certificates of compliance required by the public authority or authorities having jurisdiction thereof, so as to permit the use of the Property for the purposes set forth herein." That section also contains the tenant's covenant that the tenant "will not use or permit to be used any part of the Property for any unlawful trade or business and will not cause, maintain or permit any nuisance on the Property."

Section 3.01 of the Lease states that the tenant "shall construct and complete, or cause to be constructed and completed, on the Demised Premises a first-class office building and related ancillary structures" (the Building), in conformity with specified plans.

## 2. Prior Proceedings

Due to various agreements on lease amendments, no appraisal was required to determine a new rental amount until 2018. When the parties were unable to agree on the land's fair market value at that time, Emmett initiated the appraisal process described in the Lease. That process permitted each party to appoint one appraiser, who in turn would both then select a third. When the two appraisers appointed by the parties were unable to agree on a third, Emmett filed suit, seeking a court order appointing the third appraiser. I&G then cross-complained for declaratory relief concerning the appropriate valuation methodology for the appraisal.

The trial court directed appointment of the third appraiser and, in doing so, also concluded that the court, rather than the appraisers, had the responsibility to interpret the Lease to decide

4

the appropriate methodology for valuing the land. Emmett appealed from that ruling, and this court affirmed. (*Douglas Emmett 2013, LLC v. I&G Direct Real Estate 10, LP* (Aug. 28, 2020, B295429) [nonpub. opn.].)

On remand, the parties both moved for summary judgment regarding I&G's cross-complaint. The motions asked the trial court to resolve the parties' dispute over the meaning of section 8.01, and to determine whether that section contains a use restriction that would affect the appraisers' valuation of the land.

The trial court granted I&G's motion. The trial court concluded that section 8.01 is a use restriction. The court rejected Emmett's argument that section 8.02 contained the only use restrictions in article VIII of the Lease. The court concluded that such an interpretation would make section 8.01 meaningless because "[i]f the parties had intended for the use to be anything allowed by the law, they would have said so and not included Section 8.01." The court also rejected Emmett's argument that the language permitting "commercial" uses in section 8.01 allowed any profit-making use (including residential). The court reasoned that, under that interpretation, the reference to " 'general office use' in Section 8.01 would be superfluous."

Emmett appealed.

## DISCUSSION

### 1. Contract Interpretation Principles

The parties stipulated that their competing summary judgment motions raised only an issue of law concerning the correct interpretation of the Lease. Consistent with that stipulation, the trial court did not consider any extrinsic evidence concerning the proper interpretation of the Lease. On appeal, both parties also agree that the trial court's interpretation of the

5

Lease is an issue of law that this court reviews de novo. Thus, in reviewing the trial court's ruling we consider only the language of the Lease itself and the legal principles relevant to interpreting that language.

Several contract interpretation principles are potentially relevant to resolving the parties' dispute over the proper interpretation of the Lease. Words used in a contract are generally "to be understood in their ordinary or popular sense, rather than according to their strict legal meaning," unless the parties use them in a technical way or give them a special meaning. (Civ. Code, § 1644.) A contract should be interpreted in such a manner "as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) And the whole of a contract should be "taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

However, such general principles are ultimately simply guides to discerning the contracting parties' intent. In deciding the meaning of contracts, " '[t]he primary object of all interpretation is to ascertain and carry out the intention of the parties. [Citations.] All the rules of interpretation must be considered and each given its proper weight, where necessary, in order to arrive at the true effect of the instrument.' " (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238, quoting *Burnett v. Piercy* (1906) 149 Cal. 178, 189; Civ. Code, § 1636 ["A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful"].) Applying the general rules of construction requires flexibility and

6

judgment:  " '[S]ince the language of each instrument is sui generis, no bright-line rules of construction are available to us to aid in this endeavor.  "Analysis of cases on this subject makes it abundantly clear that it is impossible to lay down an invariable and universal rule of construction.  [Citation.]  Every transaction must be considered individually." ' "  (*City of Manhattan Beach*, at p. 243, quoting *Machado v. Southern Pacific Transportation Co.* (1991) 233 Cal.App.3d 347, 353–354.)

## II.    The Lease Restricts Use of the Property to "General Office Use, Commercial Use, and All Related or Ancillary Uses"

### A.    *Interpreting Section 8.01 as a restriction on use is necessary to give the provision meaning*

We find one contract interpretation principle dispositive here.  The only interpretation of section 8.01 of the Lease that will actually "give effect" to the language of that section is that use of the Property is *limited* to the specified purposes.  (Civ. Code, § 1641.)

Emmett argues that the use of the word "may" in section 8.01's statement that "[t]enant *may* use the Property for general office use, commercial use, and all related or ancillary uses" makes the statement merely permissive rather than mandatory.  (Italics added.)  According to Emmett, section 8.02 is the only *limitation* on use, generally restricting use of the property only to those purposes authorized by law and regulation.  Thus, under Emmett's interpretation of those two sections, the tenant may, but need not, use the Property for office and commercial purposes, and may in fact do with the Property whatever the tenant wishes subject only to legal requirements.

7

However, as the trial court correctly recognized, interpreting section 8.01 in that manner makes the section itself unnecessary and therefore meaningless.  If the parties intended the Property to be used for *any* lawful purpose, there was no need to specify in section 8.01 that it "may" be used for the *specific* purposes of office or commercial activities.

Emmett does not offer any reasonable explanation for the purpose of section 8.01 if it simply specified one possible use from a larger set of permissible uses.  Emmett suggests that the section was intended only to identify the tenant's expected use of the Property.[2]  The suggestion does not make sense for several reasons.

First, the section does not use the language of intended purpose, but rather of permission.  Section 8.01 does not say that the tenant "*intends* to use the Property;" it says the tenant "*may* use the Property."  Emmett recognizes this context in its reply brief on appeal in characterizing section 8.01 as a "permissive-use provision."  Emmett explains that the section is "an affirmative agreement by landlord and tenant that certain anticipated uses *are* unquestionably authorized."

---

[2] Emmett also asserts that such a statement about a tenant's intended use of leased property is a common feature of commercial leases.  That assertion amounts to a claim about custom and usage in commercial leases, which is an issue of fact that must be established through evidence.  (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1114; *Dutcher v. Santa Rosa High School Dist.* (1957) 156 Cal.App.2d 256, 263; cf. U. Com. Code, § 1303, subd. (c).)  Emmett offered no such evidence below.

8

This explanation correctly recognizes that section 8.01 grants the tenant permission to use the Property in a particular manner.  This very specific grant of permission implies that uses that are *not* specifically permitted are precluded.  Otherwise section 8.01 could simply have stated that the tenant was permitted to use the Property in any manner authorized by law or regulation.

Second, it was unnecessary for the parties to state in section 8.01 that the tenant intended to use the Property for a particular purpose.  That is because another section of the contract *required* the tenant to build an office building.  As mentioned, section 3.01 states that "Tenant shall construct and complete, or cause to be constructed and completed, on the Demised Premises a first-class office building and related ancillary structures."  As discussed below, Emmett disputes whether the Lease actually required the tenant to *use* the office building for that purpose.  But the requirement that the tenant actually construct a "first-class office building" is undisputed.

That explicit requirement in the Lease makes it highly unlikely that the parties would have perceived the need to spell out in a separate section of the Lease how the tenant intended to use the Property.  It would be absurd to expect that the tenant would assume the expense of constructing such a building only to immediately knock it down to put the Property to some other use.

In light of this analysis, the principle that Emmett cites that a statement of purpose in a lease does not necessarily require the intended use is irrelevant.  (See *Lippman v. Sears, Roebuck & Co.* (1955) 44 Cal.2d 136, 142; *Eltinge & Graziadio Dev. Co. v. Childs* (1975) 49 Cal.App.3d 294, 297–298 (*Eltinge*).)  Section 8.01 cannot reasonably be interpreted only as a

9

statement of the tenant's proposed use. It can only reasonably be understood as a restriction on that use.

**B.** ***Interpreting the Lease as a whole supports the conclusion that section 8.01 is a restriction on use***

Although not itself dispositive, other language in the Lease is consistent with the understanding of section 8.01 as a restriction on use rather than a mere statement of intention. Section 3.05(b)—which establishes the appraisal procedure for the recalculation of rent that is at issue in this lawsuit—states that the fair market value of the Demised Premises is to be determined as if that property were vacant, unimproved, unencumbered and free of the Lease, "but subject to the restrictions on use set forth *in Article VIII* of this Lease." (Italics added.) Article VIII contains both section 8.01 and section 8.02. If, as Emmett contends, section 8.02 were the only section containing any restrictions on use, the rent calculation provision could simply have referred directly to that section in stating that fair market value should be determined "subject to the restrictions on use set forth in *section 8.02* of this Lease."

The language in section 8.02—which unquestionably contains restrictions on use—also appears to assume that the Property will be used only for the purposes specified in section 8.01. Immediately after the statement in section 8.01 about the purposes for which the tenant "may" use the Property, section 8.02 states that "[i]n the use and occupation of the Property and the conduct of *such business* thereon" the tenant must comply with applicable laws, regulations, and other requirements, including any required certificates of occupancy and compliance "so as to permit the use of the Property for the *purposes set forth*

10

*herein.*" (Italics added.) The only "such business" and "purposes" set forth in article VIII (which itself is notably titled, "Use of Property") are the uses described in section 8.01.

The language in section 3.05(b)—the rent adjustment provision—also supports the conclusion that the "restrictions on use" in article VIII are something more than simply compliance with the law. Section 3.05 pointedly states that the fair market value of the land shall be determined as if it were vacant, unimproved, unencumbered and free of the Lease, "but subject to the restrictions on use set forth in Article VIII." The fact that the parties felt the need to specifically mention these restrictions on use as a limitation potentially affecting the value of the land suggests that the restrictions exceeded the scope of section 8.02. If the only applicable restrictions concerned the tenant's need to comply with the law and to avoid causing a nuisance, it seems unlikely that the parties would have thought those restrictions would affect the valuation of the property. Such legal restrictions exist independently of the Lease. (See *Humphries Investments, Inc. v. Walsh* (1988) 202 Cal.App.3d 766, 773 (*Humphries*) [affirming the methodology for an appraisal of land for the purpose of calculating lease payments which required determining the "highest and best use of the land without regard to the present lease 'but considering *as appropriate* the impact of any *legal* impediments to a change of use' "].)

Finally, as discussed above, section 3.01 required the tenant to construct a "first-class office building." That requirement strongly suggests that the parties intended the Property to be used for that purpose.

Emmett argues that, despite the requirement to construct such a building, the Lease permitted the tenant to adopt a

11

different purpose for the Property at some point over the life of the Lease. Emmett cites section 15.02, which permits the tenant "at any time during the term of this Lease" to "demolish and replace all or any portion of the then existing Improvements" (which includes the Building), subject to notice to the landlord and to the proviso that the replacement improvements "be of such type, size, design, quality of construction and general character as to provide, under the conditions existing at the time . . . a fair and reasonable economic utilization of the Demised Premises." Emmett argues that, under this provision, the tenant could permissibly demolish the office building and replace it with another structure or structures intended for other uses, such as residential or mixed commercial and residential.

Viewed in isolation, section 15.02 could be read in that manner. But it must be read together with section 8.01. If section 8.01 is a use restriction, its limitations also apply to any replacement structures that the tenant might construct under section 15.02. And the fact that the parties made the construction of a first-class office building *mandatory* supports the interpretation of section 8.01 as a restriction. If the parties intended to permit the tenant to use the Property for any purpose at any time during the Lease it made no sense to require the construction of an office building. And if the parties intended to permit some alternative use at some future time one would expect to see language explicitly stating that intention.

**C.** ***Emmett's arguments for a contrary interpretation are not persuasive***

      **i.** **Ordinary meaning of "may" and "shall"**

Emmett's primary argument is that the ordinary meaning of "may" is permissive rather than mandatory. Emmett also

points out that in other portions of the Lease (such as section 3.01, the provision that requires the tenant to construct an office building), the parties used the mandatory word "shall" rather than "may."

The argument has force, but ultimately is not persuasive. It is of course true that the word "may" is ordinarily permissive rather than mandatory. However, as discussed above, "may" can also be used in a permissive manner to indicate that particular conduct is allowed that would otherwise be prohibited. (See *People v. Ledesma* (1997) 16 Cal.4th 90, 95 (*Ledesma*) [" '[m]ay' is a common grammatical term encompassing multiple meanings, including an expression of 'ability' or 'power' as well as 'permission' "]. In that situation, use of the word "may" can imply that the behavior that is not specifically permitted remains prohibited.

Moreover, making sense of the meaning of a writing as a whole sometimes requires interpreting "may" as mandatory. That is true for statutory interpretation. For example, in *Ledesma* our Supreme Court interpreted the word "may" in a sentencing enhancement as mandatory. At the time, Penal Code section 12022.5, subdivision (a), provided that a sentencing enhancement "shall" be imposed for personal use of a firearm " 'unless use of a firearm is an element of the offense.' " A separate subdivision established an exception to this limitation, stating that the enhancement "may" be imposed for various specific offenses of assault with a firearm. (See *Ledesma, supra,* 16 Cal.4th at pp. 93–94.) The court concluded that the Legislature's use of the word "may" in that context meant that a trial court had the *power* to impose the enhancement for particular categories of offenses despite the limitation that

13

otherwise prohibited the enhancement when use of a firearm was an element of the offense.  In other words, the court viewed the word "may" as a grant of permission to engage in specific conduct that would otherwise have been included in a category of prohibited conduct.  (*Id.* at p. 97.)

Importantly, the court concluded that the word "may" in that context meant "shall," and that the enhancement was therefore mandatory for those offenses in which trial courts had the power to impose it.  (*Ledesma, supra,* 16 Cal.4th at p. 97.)  In reaching that conclusion, the court relied on the structure and history of the statute as well as its legislative history.  (*Id.* at pp. 96–101.)  But the court also rejected the argument that the plain meaning of "may" showed that the Legislature intended to grant discretion to a sentencing court in deciding whether to impose the enhancement.  (*Id.* at p. 97.)  The court noted that "[a]lthough the 'shall'/'may' dichotomy cited by defendant is a familiar interpretive device, it is not a fixed rule of statutory construction," and that "may" can be "permissive or empowering." (*Id.* at p. 95, citing Evans, Statutory Interpretation (1989) pp. 237–239.)  The court observed that "judicial authorities have construed 'may' as both discretionary and mandatory."  (*Ibid.*)

Similar to the word "may" in the statute at issue in *Ledesma*, the use of "may" in section 8.01 of the Lease appears to be a grant of authority to engage in a specific subset of conduct (i.e., use of the Property for general office use, commercial use, and related uses) from a set that otherwise remains prohibited (i.e., all other possible uses of the Property).  In *Ledesma*, the remaining prohibition was explicit; here it is implied.  But the context for the use of the word "may" is the same.

14

Other statutory interpretation decisions have also understood that the word "may" can be either permissive or mandatory. (See *Tarrant Bell Property, LLC v. Superior Court* (2011) 51 Cal.4th 538, 542 ["in determining whether the Legislature intended a statute to be mandatory or permissive, use in the statute of 'may' or 'shall' is merely indicative, not dispositive or conclusive"]; *Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578, 582 [interpreting the word "may" in a compassionate release statute to require the Board of Parole Hearings to recommend the recall and resentencing of an inmate if the prisoner meets the statutory criteria]; *Michael S. Yu, A Law Corp. v. Superior Court* (2020) 56 Cal.App.5th 636, 646–647 [statute stating that judgment "may" be entered upon the filing of a statement of decision by a referee or commissioner required the entry of judgment]; *South San Joaquin Irrigation Dist. v. Superior Court* (2008) 162 Cal.App.4th 146, 153–154 [term "may" in a statute concerning irrigation district interpreted as mandatory to "avoid an interpretation that would lead to absurd results"].)

Courts have been similarly flexible in interpreting the meaning of "may" in written instruments. "Ordinarily 'may' denotes the permissive rather than the mandatory but it is often construed to the contrary. 'Regardless of the instrument, however, whether constitution, statute, deed, contract or whatnot, courts not infrequently construe "may" as "shall" or "must" to the end that justice may not be the slave of grammar.' " (*Kropp v. Sterling Sav. & Loan Assn.* (1970) 9 Cal.App.3d 1033, 1044, quoting Black's Law Dict. (4th ed. 1951) p. 1131) [in the context of the parties' apparent intent, the word "may" in a trust instrument must have been mandatory rather than permissive];

15

see *Stockton Metropolitan Transit Dist. v. Amalgamated Transit Union* (1982) 132 Cal.App.3d 203, 214 [under federal and California law, the word "may" in arbitration contracts is construed as mandatory whenever either party requests arbitration]; *Cottingham v. Smith* (1938) 28 Cal.App.2d 345, 353 [language in land purchase agreement that a mortgage "may" remain as a lien against the property interpreted as mandatory].)

Thus, the ordinary meaning of the word "may" in section 8.01 as permissive can and must yield to an interpretation that makes sense in light of the provisions in the Lease as a whole.  In the context of all the Lease provisions, section 8.01 only makes sense as a restriction on use.

### ii.    Valuation of property in ground leases

Emmett argues that a ground lease should be valued based on its market value, which means the highest and best use of the land regardless of the tenant's actual use.  But that argument only makes sense when a land lease does not contain any restrictions on a tenant's use of the leased land.

When a land lease does not include any restriction on a tenant's use, it is rational to assess value based on the property's highest purpose, as that reflects the return that the landlord could reasonably expect from the leased land.  However, restrictions on use are lawful.  (Civ. Code, §§ 1997.210, subd. (a), 1997.230.)  When the parties to a lease agree on a restriction, the market value of the land is determined by the use that is permitted under the lease.  The tenant and any successor to the tenant's interest are subject to the lease's use restrictions, and the landlord has no reason to expect a return greater than the restrictions would permit.  In that case, it is reasonable to expect that the valuation of the land for purposes of calculating

16

payments due under the lease would be based on the restricted use.

The cases the parties cite are consistent with this analysis. Emmett cites cases in which courts concluded that leased property should be evaluated based on its market value rather than the tenant's actual use when the property was not subject to use restrictions. (See *Eltinge, supra,* 49 Cal.App.3d at p. 298; *Humphries, supra,* 202 Cal.App.3d at p. 771.) In contrast, I&G relies on a case holding that the " 'fair market rental value' " of leased property must be determined based upon the tenant's actual use because the lease permitted the tenant to use the property only for a specific purpose. (*Wu v. Interstate Consolidated Industries* (1991) 226 Cal.App.3d 1511, 1515.)

Thus, Emmett's reliance on the principle that leased land should be assessed based upon its market value simply begs the question whether the Property in this case is subject to a use restriction under the Lease. It is of no help in answering that question.

### iii.    Civil Code section 1997.220

Civil Code section 1997.220 provides that "[a]n ambiguity in a restriction on use of leased property by a tenant shall be construed in favor of unrestricted use." Emmett argues that, at a minimum, section 8.01 of the Lease is ambiguous and it therefore may not be interpreted as a restriction.[3]

---

[3] It is notable that, in the current dispute, this legislative directive does not function either to protect the tenant or to allow some proposed change in use to proceed that might amount to the highest and best use of the Property. Here, the tenant, not the landlord, seeks a restrictive interpretation of the lease provision

17

As Emmett recognizes, an ambiguous term in a contract is one that is capable of two different reasonable interpretations. (*Republic Bank v. Marine Nat. Bank* (1996) 45 Cal.App.4th 919, 924.)  Emmett's interpretation of section 8.01 is not absurd, but it is not reasonable in light of the Lease as a whole.  For the reasons discussed above, there is simply no logical reason for section 8.01 to exist if it is not a restriction on use.

## III.   "Commercial" Use Excludes Residential

Emmett argues that, even if section 8.01 is a restriction on use, it does not preclude residential use.  Emmett contends that section 8.01's inclusion of the terms "commercial" and "related" uses includes residential uses, such as hotels and motels, live/work units, eldercare facilities, and "mixed uses," in which residential elements are combined with office or retail uses.  In support of this interpretation, Emmett reasons that a " 'commercial' " use is "any use that makes money," which includes money-making residential uses.

This interpretation suffers from the same flaw as Emmett's argument that section 8.01 is not a restriction:  With this broad understanding of the term "commercial" in section 8.01, there would be no need for the section at all.

A restriction that limited the tenant only to uses that made money would amount to no restriction at all.  The Lease obviously

at issue.  And the tenant plans no such change in use. Nevertheless, interpreting section 8.01 as a restriction on use will affect not just the current adjustment to the lease payment but also the permissible use of the Property for the duration of the Lease.  And Civil Code section 1997.220 does not create any exception to its terms.  We therefore interpret section 8.01 in light of Civil Code section 1997.220.

contemplated that the Property would be used for the purpose of making money. After all, it required the construction of a "first-class" office building. Even under Emmett's interpretation of the demolition provisions in section 15.02, the tenant was required to replace this office building with improvements that were of "such type, size, design, quality of construction and general character" as to provide "a fair and reasonable *economic* utilization of the Demised Premises." (Italics added.) And the tenant of course was obligated to pay significant rent for the use of the Property. In this context, a use restriction that simply prohibited any nonprofit uses by the tenant would be both illogical and unnecessary.

Emmett's interpretation would also make the distinction in section 8.01 between "general office" and "commercial" uses meaningless. If "commercial" use means anything that makes money, it would of course include general office use. There would have been no reason to mention office use separately. The parties therefore must have intended the term "commercial" to be some subset of money-making activities.

It is obvious in this sentence that the terms "general office use" and "commercial use" are intended to *exclude* some use or uses that are not mentioned. In that context, the only reasonable conclusion is that the parties intended to make a distinction between office and commercial uses (i.e., business activities such as retail) on the one hand, and something else on the other hand.

The only real possibility for that "something else" was residential. Other than the irrational suggestion that the parties intended to preclude any nonprofit uses for the Property, Emmett does not suggest any possible use besides residential that the parties could have had in mind that they intended to exclude

from the scope of section 8.01.  Moreover, as the trial court pointed out, the Lease itself reflects that the parties intended that an office building be constructed on the property, and "[a]n office building usually contains offices and sometimes commercial businesses, but not residences."  Thus, interpreting section 8.01 to exclude residential uses is supported by reading the Lease as a whole.

## DISPOSITION

The judgment is affirmed.  I&G Direct Real Estate 10, LP, is entitled to recover its costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


RICHARDSON, J.

20